**DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT**,

Dated as of April__, 2015

between

**AERO MECHANICAL INDUSTRIES, INC.,** a New Mexico corporation

Debtor and Debtor in Possession under Chapter 11 of the Bankruptcy Code,

as Borrower,

and

**AERSALE, INC.,** a Florida corporation,

as Lender

_DIP Credit Agreement_

1$1,000,000.00 _____, 2015

## REVOLVING PROMISSORY NOTE

This Revolving Promissory Note (this "**Note**") is given by **Aero Mechanical Industries, Inc.**, a New Mexico corporation ("**Borrower**") in favor of AerSale, Inc., a Florida corporation ("**Lender**") to evidence such sums as Lender may hereafter loan and advance to Borrower from time to time, up to a maximum principal amount outstanding at any time of One Million Dollars ($1,000,000.00) (the "**Maximum Commitment Amount**"), pursuant to that certain Debtor-in-Possession Revolving Agreement, dated as of _____, 2015, by and between Lender and Borrower (the "**Credit Agreement**"). The amount outstanding under this Note at any given time shall be noted on Schedule I hereto by Lender and shall be conclusive for all purposes absent manifest error.

1. <u>Principal Obligation and Interest</u>. FOR VALUE RECEIVED, Borrower unconditionally promises to pay to Lender such sums as Lender may hereafter loan and advance to Borrower from time to time in accordance with and subject to the terms of the Credit Agreement. Repayment of the amounts evidenced by this Note shall be made in accordance with the terms of the Credit Agreement. Interest shall accrue and be payable on the outstanding principal balance due under this Note as specified in the Credit Agreement. Interest shall be calculated as provided in the Credit Agreement. Amounts borrowed hereunder may be repaid and re-borrowed as provided in the Credit Agreement. Advances under this Note may be requested by Borrower in accordance with the Credit Agreement.

2. <u>Maturity Date</u>. The outstanding balance due under this Note, including accrued interest, fees capitalized and added to the unpaid principal pursuant to the Credit Agreement, and principal advances made under this Note and not previously repaid, shall be due and payable in accordance with the provisions set forth in the Credit Agreement.

3. <u>Default and Acceleration</u>. Borrower shall be in default under this Note upon the occurrence of any Event of Default. If an Event of Default shall have occurred and be continuing, Lender, at its option, may exercise all of its rights and remedies set forth in the Credit Agreement and Security Agreement.

4. <u>Security Agreement</u>. The obligations of Borrower under this Note are secured pursuant to that certain Security Agreement of even date herewith given by Borrower, as Debtor, to Lender, as Secured Party (the "**Security Agreement**"). Upon the occurrence and during the continuance of an Event of Default hereunder, Lender shall have all rights and remedies of the Secured Party under the Credit Agreement and Security Agreement.

AMI Promissory Note

5.      Miscellaneous.

        a.      The invalidity or unenforceability of any one or more provisions of this Note shall in no way affect the other provisions.

        b.      All section headings used in this Note are intended solely for convenience and reference; said titles shall not affect any terms, provisions, or meanings of this Note.

        c.      The laws of the State of New York shall govern the validity, construction, performance and effect of this Note.

        d.      Any terms defined in the Credit Agreement and not otherwise defined herein are used herein with the meanings defined for those terms in the Credit Agreement.

        IN WITNESS WHEREOF, this Note has been executed effective the date first above written.

"Borrower"

**Aero Mechanical Industries, Inc**.,
a New Mexico corporation


By:_____

Its:_____

AMI Promissory Note

2

Schedule 1

| Date | Outstanding |
|------|-------------|
|      |             |
|      |             |
|      |             |
|      |             |
|      |             |
|      |             |
|      |             |

AMI Promissory Note

3

# TABLE OF CONTENTS

**Page**

RECITALS ....................................................................................................................1

ARTICLE I DEFINITIONS .........................................................................................1

   1.1     Defined Terms. ..................................................................................1
   1.2     Other Definitional Provisions. ..........................................................7
   1.3     Payment Terms; References to Money. ..............................................8

ARTICLE II AMOUNT AND TERMS OF REVOLVING LOANS...........................8

   2.1     Revolving Loan Commitments. .........................................................8
   2.2     Revolving Note. .................................................................................8
   2.3     Procedure for Revolving Loans and Payments.................................9
   2.4     Permanent Reduction of Revolving Loan Commitment....................9
   2.5     Computation of Interest. ..................................................................10
   2.6     Prepayments. ....................................................................................10
   2.7     Use of Proceeds................................................................................10
   2.8     Separate  Loans Not To Exceed Commitment..................................11
   2.9     Nature of Obligations. .....................................................................11
   2.10    Payment of Obligations....................................................................11
   2.11    No Discharge; Survival of Claims. ..................................................11

ARTICLE III REPRESENTATIONS AND WARRANTIES.....................................11

   3.1     Corporate Existence; Compliance with Law. ..................................12
   3.2     Corporate Power, Authorization, Enforceable Obligations. ...........12
   3.3     No Legal Bar.....................................................................................12
   3.4     No Material Litigation. .....................................................................12
   3.5     Taxes. ...............................................................................................13
   3.6     Purpose of Loans..............................................................................13
   3.7     Accuracy and Completeness of Information.....................................13
   3.8     The Interim Order. ...........................................................................13
   3.9     Reorganization Matters. ...................................................................13

ARTICLE IV CONDITIONS PRECEDENT...............................................................14

   4.1     Conditions to the Initial Loans Upon Entry of the Interim Order....14
   4.2     Conditions to Additional Loans upon entry of the Final Order. ......15

ARTICLE V NEGATIVE COVENANTS ....................................................................16

   5.1     Limitation on Indebtedness...............................................................16
   5.2     Limitation on Liens...........................................................................16
   5.3     Limitation on Sale of Assets. ............................................................16

ARTICLE VI TERMINATION....................................................................................16

i

6.1    Termination.................................................................................................16
6.2    Survival of Obligations Upon Termination of Financing Arrangements. ...................17

ARTICLE VII EVENTS OF DEFAULT; RIGHTS AND REMEDIES ......................................17

7.1    Events of Default. ........................................................................................17
7.2    Remedies....................................................................................................19

ARTICLE VIII MISCELLANEOUS ..............................................................................19

8.1    Amendments and Waivers. ............................................................................19
8.2    No Waiver; Cumulative Remedies. .................................................................20
8.3    Survival of Representations and Warranties. ...................................................20
8.4    Successors and Assigns; Participations and Assignments. ..............................20
8.5    Counterparts................................................................................................20
8.6    Severability. ...............................................................................................20
8.7    Governing Law. ...........................................................................................21
8.8    Submission To Jurisdiction; Waivers.  Borrower and Lender ............................21
8.9    No Waiver. .................................................................................................21
8.10   Waiver of Claims. ........................................................................................21

## LIST OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION |
| --- | --- |
| A | Revolving Note |
| B | Security Agreement |

THIS **DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT**, dated as of April __, 2015 (this "Agreement"), between (i) **AERO MECHANICAL INDUSTRIES, INC.**, corporation ("Borrower" or "the Borrower"), a debtor and a debtor-in-possession in Case No. _____ (the "Chapter 11 Case"), pending under Chapter 11 of Title 11 of the Bankruptcy Code (as defined in Section 1.1) in the United States Bankruptcy Court, District of New Mexico, and (ii) **AERSALE, INC.**, a Florida corporation ("Lender" or "the Lender").

RECITALS

WHEREAS, on April__, 2015 (the "Petition Date"), the Borrower filed a voluntary petition with the Bankruptcy Court (as defined in Section 1.1) initiating the Chapter 11 Case and has continued in the possession of its assets and in the management of its business pursuant to Bankruptcy Code Sections 1107 and 1108;

WHEREAS, Borrower desires to obtain the BB&T Release and Waiver (as defined in Section 1.1);

WHEREAS, an immediate and on-going need exists for the Borrower to obtain additional funds in order to continue the operation of its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code and, accordingly, the Borrower has requested that the Lender extend post-petition financing to the Borrower;

WHEREAS, the Lender is willing to make the Revolving Loan (as defined in Section 1.1) to the Borrower upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, Borrower and Lender hereby agree as follows:

ARTICLE I
DEFINITIONS

1.1     Defined Terms.

Capitalized terms used in the Loan Documents (as defined below) shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings and all Section references in the following definitions shall refer to Sections of this Agreement:

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person shall mean the power, directly or indirectly, either (a) to vote 5.0% or more of the securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise;

1

"Agreement" shall mean this Debtor-in-Possession Revolving Credit Agreement, as the same may from time to time be amended, modified or supplemented.

"Asset Sale" shall mean the disposition of all or substantially all of the Collateral or series of related dispositions of all or substantially all of the Collateral pursuant to the Final Order and Reorganization Plan.

"Bankruptcy Code" shall mean 11 U.S.C. §§ 101, et seq. as amended.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of New Mexico.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"BB&T" shall mean _____.

"BB&T Release and Waiver" shall mean a full, final, and irrevocable release and waiver of any security over, or interest in, any of the Borrower's assets, property, shares, interests, or otherwise in connection with the Borrower or as to any responsibility whatsoever of the Borrower in respect of the BB&T Secured Loan Debt, evidenced in one or more instruments in form and substance meeting the Lender's reasonable satisfaction.

"BB&T Secured Loan Debt" shall mean the total amount owed by [ TO BE CONFIRMED BY REVIEW OF RELEVANT DOCUMENTS ] to BB&T [which is $_____ as of the Petition Date], together with accrued, but unpaid, interest on and after _____, and pre-petition and post-petition attorneys' fees, costs of collection, and other administrative and recovery expenses for which [the Borrower] remains obligated.

"Borrower" shall mean and refer to Aero Mechanical Industries, Inc., a New Mexico corporation.

"Borrowing Availability" means, at any time, (a) the aggregate amount of the Maximum Commitment Amount at such time, *less* (b) the Carve-Out, *less* (c) the then Total Utilization of Revolving Loan Commitments.

"Business Day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in New Mexico are authorized or required by law to close.

"Carve-Out" shall mean a portion of funds available to the Borrower under the Maximum Commitment Amount, the amount of which shall be determined at a later date, which may be used for payment of allowed professional claims pursuant to Bankruptcy Code sections 326, 328, 330 and/or 331.

"Chapter 11 Case" shall have the meaning ascribed thereto in the first paragraph of this Agreement.

"Change of Control" shall mean the occurrence of any of the following:

2

(a)    the acquisition directly or indirectly by any Person, or two or more Persons acting in concert (other than the Lenders) of (i) beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934) of thirty-five percent (35%) of the outstanding Voting Securities of the Parent or (ii) the power (whether or not exercised) to elect a majority of the Parent's directors;

(b)    Borrower's Chapter 11 Case shall be converted or dismissed.

"Change of Management" shall mean any circumstance in which Mark Ozenick is not acting in a management capacity for Borrower or its Affiliates.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Collateral" shall mean the Existing Collateral as of the date of this Agreement, plus any additional personal property assets acquired by Borrower after the date of this Agreement in the ordinary course of business, and less any personal property assets of Borrower disposed of, sold, or otherwise transferred to any other Person after the date of this Agreement in the ordinary course of business.

"Commitment Termination Date" shall mean the earliest of (a) the Maturity Date, (b) the date that is thirty (30) days after entry of the Interim Order by the Bankruptcy Court if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such thirty (30) day period, (c) the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court, and (d) the acceleration of the Revolving Loans and the termination of the Revolving Loan Commitments in accordance with the terms hereof, including Section 7.2.

"Committees" shall mean collectively, the official committee of unsecured creditors and any other committee formed, appointed, or approved in the Chapter 11 Case and each of such Committees shall be referred to herein as a Committee.

"Default" shall mean any of the events specified in Section 7.1, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Deposit Account" shall mean a "deposit account" as defined in Section 9-102 of the Uniform Commercial Code as in effect from time to time in the State of New Mexico.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Event of Default" shall have the meaning ascribed thereto in Section 7.1.

"Existing Collateral" shall mean the Debtor's assets as fully set forth in the Security Agreement, attached as Exhibit B.

3

"Final Closing Date" shall mean the date which is the date of entry of a final order approving of the Agreement.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court which order shall be satisfactory in form and substance to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur Indebtedness, and provides for a senior lien securing the Lender's claims.

"Fiscal Year" shall mean any of the annual accounting periods of the Borrower ending on December 31 of each year.

"Indebtedness" shall mean the amount of any consensual obligations, commitments, undertakings, or other indebtedness payable by Borrower (including principal and interest thereon) pursuant to any agreement entered into by Borrower with respect to the borrowing of money from any Person.

"Initial Budget" shall mean collectively the Borrower's operating budget, on a consolidated basis, for the 13-week period commencing on the Interim Closing Date, which operating budget includes, on a line item basis, projected weekly cash receipts and all expenditures, all on a consolidated basis, proposed to be made during such 13-week period, and incorporates, without double counting, the variances permitted pursuant to the Postpetition Financing Orders, which operating budget additionally shall be in form and substance acceptable to the Lender.

"Interest Payment Date" means the first Business Day of each month.

"Interim Closing Date" shall mean April __, 2015.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrower to execute and perform under the terms of this Agreement.

"IRS" shall mean the Internal Revenue Service, or any successor thereto.

"Lender" shall have the meaning ascribed thereto in the first paragraph of this Agreement.

"Lien" shall mean (a) any mortgage, pledge, statutory deemed trust, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale

4

or other title retention agreement and any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC (other than the filing of any such financing statement which states therein that such filing is a precautionary filing only and is filed in connection with "true leases" only) or comparable law of any jurisdiction), (b) any arrangement or agreement which prohibits any loan party from creating any mortgage, pledge, hypothecation, deposit arrangement, encumbrance, lien, charge or other security interest, or from entering into any agreement or arrangement described in clause (a) of this definition or (c) the sale, assignment, pledge or transfer for security of any accounts, general intangibles or chattel paper of any loan party with or without recourse.

"Litigation" shall have the meaning ascribed thereto in Section 3.4.

"Loans" shall mean the Revolving Loans.

"Loan Documents" shall mean this Agreement, the Revolving Note and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrower in connection with the Agreement or the transactions contemplated hereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all exhibits thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such Agreement as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, operations, property or condition (financial or otherwise) of the Borrower, (b) the ability of Borrower to fully and timely perform its Obligations or (c) the validity, priority or enforceability of this Agreement, any of the Revolving Note or any of the other Loan Documents, or the rights or remedies of the Lenders hereunder or thereunder.

"Maturity Date" shall mean the earlier of [October 15, 2015] or entry of a final decree closing the bankruptcy case.

"Maximum Commitment Amount" shall mean One Million Dollars ($1,000,000.00).

"Note" shall mean the Revolving Note.

"Notice of Revolving Loan" shall have the meaning ascribed thereto in Section 2.3.

"Obligations" shall mean the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Revolving Loans) the Revolving Note and under this Agreement, or any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, or expenses.

5

"Permitted Encumbrances" means inchoate Liens for taxes, assessments or governmental charges or levies or Liens for taxes, assessments, governmental charges or levies not yet due or which are being contested in good faith by appropriate proceedings; *provided* that adequate reserves with respect thereto are maintained on the books of the Borrower and the lien of the Security Agreement.

"Person" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Petition Date" shall have the meaning ascribed thereto in the Recitals.

"Postpetition Financing Orders" shall mean the Interim Order and the Final Order.

"Reimbursement Date" shall have the meaning ascribed to it in Section 2.4.

"Reorganization Plan" shall mean a plan of reorganization or liquidation filed by the Borrower in the Chapter 11 Case.

"Requirement of Law" as to any Person shall mean the certificate of incorporation and bylaws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other governmental authority, in each case, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" shall mean, as to any Person, the chairman of the board of directors, the chief executive officer, the president, the vice president of such Person or, with respect to financial matters, the chief financial officer, the treasurer, the assistant treasurer (if the assistant treasurer is an officer or serves in the capacity of the chief financial officer of such Person) or controller (if the controller is an officer or serves in the capacity of the chief financial officer of such Person) of such Person.

"Revolving Loan" shall have the meaning ascribed thereto in Section 2.1, as such Revolving Loans may be increased by interest and Fees capitalized and added to the principal balance thereto pursuant to the terms of this Agreement.

"Revolving Loan Commitment" means Lender's commitment to make Revolving Loans to the Borrower as set forth herein.

"Revolving Note" shall have the meaning ascribed thereto in Section 2.2.

"Security Agreement" shall mean that certain agreement entered into by and between Borrower and Lender, a form of which is attached hereto as "Exhibit B," which grants Lender a super priority administrative claim lien over and security interest in all assets of Borrower, having priority over all other security and claims over and/or against such assets, and as security for repayment of the Loans.

6

"Senior Lien" shall mean a lien against all of the Borrower's assets, as more particularly described herein and in the Security Agreement, subject to existing and non-avoidable liens of creditors against the Borrower's assets.

"Subsidiary" or "Subsidiaries" of a Person shall mean a corporation, partnership or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the occurrence of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise indicated, all references to Subsidiaries are to the Subsidiaries of Borrower.

"Total Utilization of Revolving Loan Commitments" means, as of any date of determination, the sum of the aggregate principal amount of all outstanding Revolving Loans including interest and fees that are capitalized and added to the principal balance of the Revolving Loans pursuant to the terms of this Agreement.

1.2     Other Definitional Provisions.

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have their respective defined meanings when used in the Note or other document made or delivered pursuant hereto.

(b)     As used herein, in the Note or other document made or delivered pursuant hereto, accounting terms relating to either Borrower and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under normal and customary use.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole, including all Exhibits, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in the Agreement or any such Exhibit.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)     Unless the context otherwise requires, each reference herein to any agreement, document or instrument (including the Loan Documents) shall be deemed a reference to such agreement, document or instrument as amended, restated, supplemented or otherwise modified from time to time.

(e)     The term "includes" and "including" shall not be construed to imply any limitation.

(f)     In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."  Periods of days referred to in this Agreement shall be counted in calendar days unless Business Days are expressly prescribed. Any period determined

7

hereunder by reference to a month or months or year or years shall end on the day in the relevant calendar month in the relevant year, if applicable, immediately preceding the date numerically corresponding to the first day of such period, provided that if such period commences on the last day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month during which such period is to end), such period shall, unless otherwise expressly required by the other provisions of this Agreement, end on the last day of the calendar month.

      1.3     <u>Payment Terms; References to Money</u>.

Except as expressly set forth herein to the contrary, (a) all payments made by the Borrower shall be made in Dollars in respect of principal and interest on the Revolving Loans, and (b) to the extent not otherwise indicated, all amounts of money referenced herein shall mean and be references to amounts of money denominated in Dollars.

ARTICLE II
AMOUNT AND TERMS OF REVOLVING LOANS

      2.1     Revolving Loan Commitments.

Subject to the terms and conditions hereof (including without limitation the conditions precedent set forth in <u>ARTICLE IV</u> hereof),

Lender agrees to make Revolving Loans (each, a "<u>Revolving Loan</u>") to Borrower from time to time until the Commitment Termination Date in an aggregate principal amount at any one time outstanding not to exceed the Borrowing Availability; <u>provided</u> that Lender shall not be permitted or required to make any Revolving Loan if:

      (a)     after giving effect thereto, the sum of the outstanding aggregate principal amount of Revolving Loan would exceed Lender's Maximum Commitment Amount; or

      (b)     after giving effect thereto, the aggregate outstanding principal amount of Revolving Loan outstanding would exceed the Borrowing Availability.

Until the Commitment Termination Date, the Borrower may from time to time borrow, prepay the Revolving Loans in whole or in part, and re-borrow under this <u>Section 2.1</u>, all in accordance with the terms and conditions hereof (subject in particular to any reductions in Revolving Loan Commitments pursuant to <u>Sections 2.4</u>) and in accordance with the Initial Budget. Each Revolving Loan shall be denominated in Dollars.

      2.2     <u>Revolving Note</u>.

The Revolving Loan made by Lender shall be evidenced by a promissory note of the Borrower made to the order of Lender substantially in the form of <u>Exhibit A</u> (a "<u>Revolving Note</u>"), with appropriate insertions as to date and principal amount, payable to the order of Lender and in a principal amount equal to the lesser of (a) the amount of the Revolving Loan Commitment and (b) the aggregate unpaid principal amount of all Revolving Loans made by Lender. Each Revolving Note shall (i) be stated to mature on the Maturity Date or such earlier

8

date the Revolving Loans shall be due and payable in full, whether by acceleration or otherwise, pursuant to the terms of this Agreement and (ii) provide for the payment of interest.

2.3    Procedure for Revolving Loans and Payments.

(a)    The Borrower may borrow under the Revolving Loan Commitments until the Commitment Termination Date on any Business Day; provided that (i) the Borrower may not make more than one borrowing per calendar week and (ii) each borrowing under the Revolving Loan Commitment shall be in an amount equal to and not less than $50,000 or a whole multiple of $50,000 in excess thereof. Prior to 2:00 p.m. Mountain Standard Time on the borrowing date requested by the Borrower, Lender will make the amount of the Revolving Loan available to the account of the Borrower.

(b)    The Revolving Loan (including all interest and fees capitalized and added to the principal balance of the Revolving Loan) shall be paid, in full, on the Commitment Termination Date, pursuant to the terms herein. Lender's obligation to make Revolving Loans shall terminate at the close of business on the Business Day immediately preceding the Commitment Termination Date, unless sooner terminated in accordance with the terms hereof.

2.4    Permanent Reduction of Revolving Loan Commitment.

The Borrower shall have the right, upon not less than five Business Days' notice, to terminate the Revolving Loan Commitment or, from time to time, to reduce permanently the amount of the Revolving Loan Commitment in whole, but not in part. Such reduction of the Revolving Loan Commitment shall be accompanied by payment in full of all outstanding principal and accrued interest thereon, to and including the date of such prepayment, together with any additional amounts owing and any outstanding fees and expenses due and owing.

2.5    Interest Rates and Payment Dates.

(a)    Each Revolving Loan (and all amounts capitalized and added to the principal balance of the Revolving Loans) shall bear interest (compounded monthly) at a rate *per annum* of twelve per cent (12.0%).

(b)    Notwithstanding the foregoing, in the event an Event of Default has occurred and is continuing, the Revolving Loan shall bear interest at a rate *per annum* equal to the rate set forth above plus 4.0% from the date of occurrence of such Event of Default until the date such Event of Default is cured or waived (after as well as before judgment). In addition, should any interest on Revolving Loan or any other obligations payable hereunder not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest (to the extent permitted by law in the case of interest on interest) at a rate *per annum* equal to rate set forth above plus 4.0%, in each case, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

(c)    Accrued interest on the Revolving Loan will be added to the outstanding principal balance of the Revolving Loan as of each Interest Payment Date without any obligation of Borrower to pay the same on the Interest Payment Date. Amounts representing interest which is added to the outstanding principal balance of Revolving Loan, shall thereafter bear interest in

9

accordance with this Section and otherwise be treated as a Revolving Loan for all purposes of this Agreement (except for purposes of determining the Total Utilization of Revolving Loan Commitments). Interest accruing pursuant to Section 2.5(b) shall be payable from time to time on demand.

2.6     Computation of Interest.

(a)     Interest shall be calculated for the actual number of days elapsed on the basis of a hypothetical year of 360 days.

(b)     Each determination of an interest rate by Lender pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower in the absence of manifest error

2.7     Prepayments.

(a)     Optional Prepayments.  Borrower may, at any time and from time to time prepay the Revolving Loans, in whole or in part, without premium or penalty, upon written notice to the Lender by 11:00 a.m. (Mountain Standard Time) on such date of prepayment, in each case, specifying the date and amount of prepayment.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with any amounts payable, accrued interest to such date on the amount prepaid and any outstanding fees and expenses then due and owing.

(b)     Mandatory Prepayments.

(i)     If at any time the Total Utilization of the Revolving Loan Commitments exceeds the Maximum Commitment Amount, Borrower shall repay the outstanding Revolving Loan to the extent required to eliminate such excess.

(ii)     In the event the acquisition of Borrower by Lender pursuant to a purchase agreement (the "Purchase Agreement") is not consummated, Borrower shall prepay on demand all Loans outstanding together with any other amounts due and payable hereunder.

(iii)     Borrower shall prepay all amounts as specified in Section 5.3.

2.8     Use of Proceeds.

The Borrower shall utilize the proceeds of the Revolving Loan solely (a) to pay $500,000 to BB&T in exchange for the receipt by the Borrower (and, as necessary, the filing) of the BB&T Release and Waiver, (b) to extinguish to the Lender's satisfaction any other pre-existing liens against the Borrower's assets, including any in favor of the Internal Revenue Service, (c) to fund operations consistent with the Initial Budget and (d) for payment of its allowed professional fees, as permitted by the Carve-Out.  The Borrower shall not be permitted to use the proceeds of the Loans: (i) to finance in any way, any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of the Lender or its rights and remedies under this Agreement, the other Loan Documents, the Interim Order or the Final Order, (ii) to finance

10

the payment of, or application for authority to pay, any prepetition claim without the Lender's prior written consent, (iii) to make any distribution under a Reorganization Plan in any Chapter 11 Case, or (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of Lender.

2.9     Separate Loans Not To Exceed Commitment.

All Loans to the Borrower and all of the other Obligations of Borrower arising under this Agreement and the other Loan Documents shall constitute separate loans to the Borrower, evidenced by a separate promissory note executed by the Borrower; provided, however, that the Total Utilization of Revolving Loan Commitment shall not exceed the Maximum Commitment Amount.

2.10     Nature of Obligations.

Borrower hereby covenants, represents and warrants that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations of the Borrower hereunder and under the Loan Documents shall, pursuant to Section 364(c)(2) and Section 364(c)(3) of the Bankruptcy Code, at all times constitute allowed secured claims in the Chapter 11 Case having priority over all secured or unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, provided that the BB&T Release and Waiver shall have been filed. The Borrower further agrees to execute the Security Agreement which shall create the Lender's senior lien on all Borrower's assets effective upon entry of the Interim Order, subject to existing and non-avoidable liens of creditors against the Borrower's assets, consistent with the terms hereof.

2.11     Payment of Obligations.

Upon the Maturity Date (or such earlier date to the extent provided herein), the Lender shall be entitled to immediate payment of the Obligations then outstanding without further application to or order of the Bankruptcy Court.

2.12     No Discharge; Survival of Claims.

Borrower agrees that to the extent the Obligations are not satisfied in full, (i) its Obligations arising hereunder shall not be discharged by the entry of a order confirming a Reorganization Plan (and the Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code hereby waives any such discharge) and (ii) the secured lien granted to Lender pursuant to the Interim Order and Final Order shall not be affected in any manner by the entry of an order confirming a Reorganization Plan in any Chapter 11 Case.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

To induce Lender to make the Loans, the Borrower makes the following representations and warranties to Lender with respect to Borrower, each and all of which shall survive the execution and delivery of this Agreement.

11

### 3.1 <u>Corporate Existence; Compliance with Law</u>.

Borrower (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation; (b) is duly qualified as a foreign corporation and is in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect; (c) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, has the requisite corporate power and authority and the legal right to effect the transactions contemplated hereby and by the other Loan Documents to which it is a party; (d) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, has the requisite corporate power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now, heretofore and proposed to be conducted; and (e) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

### 3.2 <u>Corporate Power, Authorization, Enforceable Obligations</u>.

Upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), Borrower has the corporate power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and to authorize the execution, delivery and performance of the Loan Documents to which it is a party. Borrower has the appropriate power and authority to borrow hereunder and has taken all necessary corporate action to authorize the borrowings on the terms and conditions set forth in this Agreement and in the Note. Subject to the entry of the Interim Order and the Final Order, the Agreement has been, and each other Loan Document to which it is a party will be, duly executed and delivered on behalf of Borrower. Upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), this Agreement constitutes, and each other Loan Document to which Borrower is a party when executed and delivered will constitute, a legal, valid and binding obligation of the Borrower, enforceable against the applicable Borrower in accordance with its terms (whether enforcement is sought by proceedings in equity or at law).

### 3.3 <u>No Legal Bar</u>.

Except for the effect of the filing of the Chapter 11 Case, the execution, delivery and performance of the Loan Documents to which Borrower is a party, the borrowings by each Borrower hereunder and the use of the proceeds thereof (a) will not violate any Requirement of Law or contractual obligation of Borrower, (b) will not accelerate or result in the acceleration of any payment obligations of Borrower, and (c) will not result in, or require, the creation or imposition of any Lien on any of the respective properties or revenues of any Borrower pursuant to any such Requirement of Law or Contractual Obligation, other than as set forth herein.

### 3.4 <u>No Material Litigation</u>.

No litigation, investigation or proceeding of or before any arbitrator or governmental authority (collectively, "<u>Litigation</u>") is pending or, to the knowledge of Borrower, threatened by

or against Borrower (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) which could reasonably be expected to have a Material Adverse Effect.

3.5     Taxes.

Borrower has filed or caused to be filed all tax returns which, to the knowledge of the Borrower are required to be filed.  Borrower has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any governmental authority (other than any tax, fee or other charge the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with customary usage has been provided on the books of such Borrower); and, no tax Lien has been filed, and, to the knowledge of Borrower, no claim is being asserted, with respect to any such tax, fee or other charge.

3.6     Purpose of Loans.

The Borrower shall not use the proceeds of any Revolving Loan hereunder (a) other than in accordance with this Agreement.

3.7     Accuracy and Completeness of Information.

All information, reports and other papers and data with respect to the Borrower (other than projections) furnished to the Lender by or on behalf of Borrower, were, at the time furnished, complete and correct in all material respects, or has been subsequently supplemented by other information, reports or other papers or data, to the extent necessary to give the Lender a true and accurate knowledge of the subject matter in all material respects. There is no fact known to any party which has, or could reasonably be expected to have, a Material Adverse Effect.

3.8     The Interim Order.

On the date of the making of the initial Revolving Loan hereunder, the Interim Order shall have been entered and shall not have been stayed, amended (without the Lender's prior written consent, which consent shall not be unreasonably withheld), vacated, reversed, rescinded or otherwise modified in any respect. On the date of the making of any Revolving Loan, the Interim Order or the Final Order, as the case may be, shall have been entered and shall not has been amended, stayed, vacated or rescinded without the Lender's consent. Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations of the Borrower hereunder and under the other Loan Documents, the Lender shall be entitled to immediate payment of such obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

3.9     Reorganization Matters.

(a)     The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for the hearing for the

13

approval of the Interim Order has been given and proper notice for the hearing for the approval of the Final Order will be given.

(b)     After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed secured claims in the Chapter 11 Case pursuant to Section 364(c)(2) and Section 364(c)(3) of the Bankruptcy Code, having priority over all secured or unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever.  The Borrower further agrees to execute the Security Agreement which shall create the Lender's senior lien on all Borrower's assets effective upon entry of the Interim Order, subject to the existing liens of creditors against the Borrower's assets that are valid and non-avoidable.

(c)     Lender has the option of crediting the outstanding balance due under the Revolving Note to the purchase price offered for the Collateral under any Chapter 11 plan of reorganization presented to the Bankruptcy Court at such time.  If Lender is the successful buyer of the Collateral in any Asset Sale, after crediting the amount of such outstanding Revolving Note balance to the purchase price thereof, the Revolving Loans shall be deemed to have been paid in full by the Borrower and such Revolving Note shall be discharged as satisfied in full.

(d)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the Maturity Date, Lender shall be entitled to immediate payment of the Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

ARTICLE IV
CONDITIONS PRECEDENT

4.1     <u>Conditions to the Initial Loans upon Entry of the Interim Order</u>.

The obligations of the Lender to make the initial Revolving Loans in an amount not to exceed the Maximum Commitment Amount, or to take, fulfill, or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner satisfactory to the Lender, or waived in writing by the Lender:

(a)     <u>Loan Documents</u>.  The Lender shall have received this Agreement, the Revolving Note and all other Loan Documents, each other agreement, documents and instruments relating to the loan and other credit transactions contemplated by this Agreement, each duly executed where appropriate and in form and substance satisfactory to the Lender.

(b)     <u>No Material Adverse Effect</u>.  No Material Adverse Effect shall have occurred with respect to Borrower, other than those which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Case.

14

(c)     Interim Order.  Lender shall have received a copy of the Interim Order, *inter alia*, approving the transactions contemplated hereby and finding that the Lender is extending credit to the Borrower, in good faith, within the meaning of section 364(e) of the Bankruptcy Code.  Such Interim Order (i) shall be in form and substance satisfactory to Lender, (ii) shall have been entered upon an application of the Borrower reasonably satisfactory in form and substance to Lender, (iii) shall be in full force and effect and (iv) shall not have been stayed, reversed, vacated or rescinded or, without the consent of the Lender, modified or amended in any respect and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrower of any of its Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(d)     Litigation.  No litigation shall have been commenced or remain active (meaning that such litigation has not been stayed by the commencement of the Chapter 11 Case) (i) which, if successful, would have a Material Adverse Effect on (1) Borrower taken as a whole or (2) its business or ability to repay the Revolving Loans or (ii) which would challenge this Agreement, Postpetition Financing Orders or the transaction contemplated thereby.

(e)     No Alternate Transaction.  No party (except for the Lender) shall be in discussions with Borrower in respect of any transaction relating to the acquisition of all or substantially all of the Collateral.

4.2     Conditions to Additional Loans upon Entry of the Final Order.

The obligations of the Lender to make the additional Revolving Loans in an amount not to exceed the Maximum Commitment Amount on the Final Closing, or to take, fulfill, or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner satisfactory to the Lender:

(a)     Conditions Set Forth in Section 4.1.  Each of the conditions precedent set forth in Section 4.1 shall be in full force and continuing effect.

(b)     Final Order.  Unless the Court orders otherwise, in no later than thirty (30) days after the Interim Closing Date, Lender shall have received a copy of the Final Order, *inter alia*, approving the transactions contemplated hereby and finding that the Lender is extending credit to the Borrower in good faith within the meaning of section 364(e) of the Bankruptcy Code.  Such Final Order (i) shall be in form and substance satisfactory to Lender, (ii) shall have been entered upon an application of the Borrower reasonably satisfactory in form and substance to the Lender, (iii) shall be in full force and effect and (iv) shall not has been stayed, reversed, vacated or rescinded or, without the consent of the Lender, modified or amended in any respect and, if the Final Order is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrower of any of its Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

## ARTICLE V
## NEGATIVE COVENANTS

From the date hereof and for so long as the Revolving Loan Commitments remain in effect, any Revolving Note remains outstanding and unpaid or any Obligation is owing to the Lender hereunder, Borrower will not, (and will not apply, unless in connection with an amendment to the Agreement that is reasonably likely to be approved by the Lender to the Bankruptcy Court for authority to):

### 5.1 Limitation on Indebtedness.

Create, incur, assume or permit to exist any Indebtedness, or enter into any agreement or binding commitment to create, incur, assume or suffer to exist any Indebtedness, except the Revolving Loans and the other Obligations created under this Agreement.

### 5.2 Limitation on Liens.

Create, incur, assume or permit to exist any Lien on or with respect to its accounts or any of its other properties, assets or revenues, (whether now owned or hereafter acquired), except for the Permitted Encumbrances and the lien of any pre-Petition Date security interest in favor of any lessor or lender; or Incur, create, assume, suffer to exist or permit any super priority Lien which is pari passu with or senior to the claims of the Lender granted pursuant to this Agreement and the Postpetition Financing Orders except as provided herein.

### 5.3 Limitation on Sale of Assets.

Convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets (including, without limitation, any receivables and fee or leasehold interests), whether now owned or hereafter acquired, in each case, in one transaction or a series of transactions to any Person, except:

(a) as otherwise approved in writing prior to the consummation thereof by Lender; and

(b) the sale or other disposition of obsolete or worn out property in the ordinary course of business and having a book value not exceeding $10,000 in the aggregate in any Fiscal Year, provided that the net proceeds of each transaction (if any) are applied in prepayment of the Revolving Loans.

## ARTICLE VI
## TERMINATION

### 6.1 Termination.

The financing arrangements contemplated hereby shall be in effect until the Commitment Termination Date, and the Loans and all other Obligations shall be automatically due and payable in full on such date.

16

6.2    <u>Survival of Obligations Upon Termination of Financing Arrangements</u>.

Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Borrower or the rights of Lender relating to any unpaid portion of the Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date. Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Borrower, and all rights of Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Commitment Termination Date.

ARTICLE VII
EVENTS OF DEFAULT; RIGHTS AND REMEDIES

7.1    <u>Events of Default</u>.

Notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court or any notice to Borrower, and subject to <u>Section 7.2</u>, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "<u>Event of Default</u>" hereunder:

(a)    (i) Borrower shall fail to pay any principal of any Revolving Note when due in accordance with the terms thereof or hereof or (ii) Borrower shall fail to pay any interest on any Revolving Note, any other Obligation or any other amount payable hereunder when any such interest or other amount becomes due in accordance with the terms thereof or hereof if, in either such case, such failure is not cured within ten (10) days of written notice from Lender; or

(b)    One or more judgments or decrees shall be entered after the Petition Date against the Borrower involving in the aggregate a liability (to the extent not covered by third-party insurance as to which the insurer has acknowledged coverage) of $10,000 or more, net of insurance proceeds, and all such judgments or decrees shall not has been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(c)    The occurrence of any additional "Event of Default" identified in the Interim Order (or, when applicable, analogous paragraph of the Final Order) not identified herein; or

(d)    The occurrence of any of the following in the Chapter 11 Case:

(i)    the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the any of the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

17

(ii)     the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Borrower (powers beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(iii)     the entry of an order of competent jurisdiction (1) reversing, staying, vacating or rescinding either the Interim Order or the Final Order, or either otherwise ceases to be in full force and effect (except in the case of the replacement of the Interim Order with the entry of the Final Order) or (2) amending, supplementing or otherwise modifying the Interim Order or the Final Order without the written consent of the Lender or the filing of a motion for reconsideration in respect to the total Revolving Loan Commitments, without Lender's consent;

(iv)     Borrower materially violates or breaches the Postpetition Financing Orders or files any pleadings seeking, joining in, or otherwise consenting to any material violation or breach of the Postpetition Financing Orders;

(v)     the bringing of a motion, taking of any action or the filing of any Reorganization Plan or disclosure statement attendant thereto by the Borrower in the Chapter 11 Case: (1) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (2) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; or (3) any other action or actions adverse to Lender's rights and remedies hereunder;

(vi)     the entry of an order in the Chapter 11 Case granting any super priority administrative claim or Lien equal or superior to that granted to the Lender;

(vii)     the Final Order is not entered within 30 days following the expiration of the Interim Order, unless a continuance is ordered by the Court;

(viii)     the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement;

(ix)     the entry of an order in the Chapter 11 Case confirming a Reorganization Plan that does not contain a provision for termination of the Revolving Loan Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(x)     the Bankruptcy Court shall enter an order or orders granting relief from or modifying the automatic stay applicable under Section 362 of the

18

Bankruptcy Code to permit one or more creditors to execute upon, enforce or perfect a lien on any assets of the Borrower;

(xi)     Commencement of any suit against the Lender that would in any way reduce, set off, or subordinate the Obligations under this Agreement; if any such suit is commenced by any party other than the Borrower, and in the reasonable judgment of the Lender, such suit has a reasonable possibility of success, and if successful, would be reasonably likely to has a material adverse effect on (1) the Borrower or (2) Borrower's business or their ability to repay the Revolving Loans made under this Agreement;

(xii)     the payment of, or application for authority to pay, any prepetition claim without the Lender's prior written consent (which shall not be unreasonably withheld) or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement.

(e)     <u>Change of Control.</u>  The occurrence of a Change of Control.

(f)     <u>Change of Management</u>.  The occurrence of a Change of Management.

(g)     <u>Default under the Purchase Agreement</u>.  The occurrence of any default or event of default (or like term) under the Purchase Agreement.

7.2     <u>Remedies</u>.

Upon the occurrence and during the continuance of an Event of Default, and without further order of or application to the Bankruptcy Court, the Lender shall, by notice to the Borrower (with a copy to counsel for the Committee appointed in the Chapter 11 Case, and to the United States Trustee for the District of New Mexico), take one or more of the following actions, at the same or different times: (i) terminate forthwith the Revolving Loan Commitments; (ii) declare the Loans or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Loans together with accrued interest thereon and any unpaid accrued fees and expenses (including the Lender's attorneys fees) and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and (iii) take any other action or exercise any and all other rights or remedies under the Loan Documents, and under applicable law available to the Lender.

## ARTICLE VIII
## MISCELLANEOUS

8.1     <u>Amendments and Waivers</u>.

Neither this Agreement, any Revolving Note or any other Loan Document, nor any terms hereof or thereof may be amended, restated, supplemented or modified except in writing signed by each of the parties hereto.

19

8.2       <u>No Waiver; Cumulative Remedies</u>.

No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

8.3       <u>Survival of Representations and Warranties</u>.

All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Revolving Note and the making of the Loans hereunder.

8.4       <u>Successors and Assigns; Participations and Assignments</u>.

(a)       This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns, including any trustee appointed in this case.

(b)       Lender may, in accordance with applicable law, sell or assign its rights under this Agreement and any Obligations of Borrower hereunder to any Person (each, an "<u>Assignee</u>"), subject to the terms and provisions of this Agreement, which shall be binding upon any such Assignee. Lender or such Assignee shall give written notice to Borrower of any such transaction within five (5) days following the effective date thereof.

(c)       The Borrower authorizes Lender to disclose to any Assignee and any prospective Assignee, any and all financial information in Lender's possession concerning the Borrower which has been delivered to Lender, subject to Lender's customary confidentiality and non-disclosure agreement and solely for the purpose of analyzing such Assignee's investment in the Loans.

8.5       <u>Counterparts</u>.

This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all said counterparts taken together shall be deemed to constitute one and the same instrument. A copy of this Agreement signed by all the parties shall be lodged with the Borrower and the Lender.

8.6       <u>Severability</u>.

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

20

[ ADD A NOTICES PROVISION ]

8.7     Governing Law.

THIS AGREEMENT AND THE REVOLVING NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE REVOLVING NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS.

Submission to Jurisdiction; Waivers.   Borrower and Lender hereby irrevocably and unconditionally:

(a)     submit for themselves and their property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the Bankruptcy Court;

(b)     consent that any such action or proceeding may be brought in the Bankruptcy Court and waive any objection that they may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agree not to plead or claim the same;

(c)     agree that nothing contained herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(d)     waive, to the maximum extent not prohibited by law, any right they may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

(e)     **WAIVER OF JURY TRIAL.** EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.8     No Waiver.

No failure on the part of Lender to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

8.9     Waiver of Claims.

Upon the effectiveness of this Agreement, the Borrower shall be deemed to have (a) released and forever discharged Lender and its respective subsidiaries, agents, employees,

21

officers, directors, managers, attorneys, affiliates, successors and assigns (collectively, the "Released Parties") of and from any and all liabilities, claims, obligations, indebtedness, liens, causes of action and rights of any kind, character or nature whatsoever, whether known or unknown, whether fixed or contingent, and whether liquidated or unliquidated, that the Borrower may have or claim to have against any such Released Party and which arises out of or is connected in any way with any action of commission or omission of the Borrower existing or occurring on or prior to the date of this Agreement, including without limitation any claims, liabilities or obligations relating to or arising out of or in connection with any of the transactions contemplated by any of the Loan Documents, from the beginning of time until the execution and delivery of this Agreement (collectively, the "Released Claims") and (b) agrees forever to refrain from commencing, instituting or prosecuting any law suit, action or other proceeding against any of the Released Parties with respect to any of such Released Claims.

8.10    Conflict.

To the extent that there is a conflict between the terms and conditions of this Agreement, the Revolving Note, the Security Agreement, and the Postpetition Financing Orders, the terms and conditions of the Postpetition Financing Orders shall govern.

8.11    Attorneys Fees.

Borrower will pay to Lender in addition to all of the other indebtedness all reasonable attorney's fees incurred by Lender to preserve or protect its interests, collect any amounts secured hereby, or in the exercise of any rights or remedies to which it is entitled, regardless of whether legal proceedings are commenced.

*      *      *      *

22

IN WITNESS WHEREOF, the parties hereto has caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

AERO MECHANICAL  INDUSTRIES, INC., as Borrower

By: _____
    Mark Ozenick, its President and CEO

AERSALE, INC., as Lender

By: _____
    Name:
    Title:

23

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement") is made and entered into this ___ day of April, 2015, by and between **Aero Mechanical Industries, Inc.**, a New Mexico corporation ("Debtor") and **AerSale, Inc.**, a Florida corporation ("Secured Party").

## RECITALS

A.     Debtor is indebted to Secured Party pursuant to that certain Debtor-in-Possession Revolving Credit Agreement of even date herewith (the "Credit Agreement"), with respect to financing provided by Secured Party in connection with that certain Chapter 11 bankruptcy proceeding styled *In re Aero Mechanical Industries, Inc.*, pending in the United States Bankruptcy Court, District of _____, Case No. _____.  Said indebtedness is evidenced by a Promissory Note given by Debtor, as Borrower, to Secured Party, as Lender, in a principal amount not to exceed $1,000,000.00 (the "Note").

B.     The parties desire to enter into this Security Agreement for the purpose of securing Debtor's obligations to Secured Party under the Note and Credit Agreement pursuant to the terms and conditions set forth below.

## AGREEMENT

**NOW THEREFORE**, in consideration of the above recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     <u>Creation of Security Interest.</u>  Debtor hereby grants, assigns, conveys, mortgages, pledges, hypothecates and transfers to Secured Party a first priority security interest in all of Debtor's right title and interest in, to under and in respect of the Collateral (defined below) pursuant to the UCC (the "Security Interest").  The term "UCC" means the Uniform Commercial Code – Article 9 Secured Transactions, as enacted in the State of New York, and all regulations promulgated thereunder, and all revisions thereof or thereto.  Terms not otherwise defined in this Security Agreement shall have the meanings attributed to such terms in the UCC.

2.     <u>Obligations Secured.</u>  The Security Interest secures the following obligations of Debtor (the "Obligations"):

(a)     payment of any and all amounts due and payable by Debtor to Secured Party in connection with Debtor's obligations under the Note and Credit Agreement;

(b)     the reasonable expenses and costs incurred or paid by Secured Party in the preservation, enforcement and realization of the rights of Secured Party under this Security Agreement;

(c)     performance of all obligations of Debtor under this Security Agreement.

1

3. <u>Description of Collateral</u>. The term "<u>Collateral</u>" means all assets of the Debtor, wherever located, and now owned or hereafter acquired, including, without limitation, all of its personal and real property, accounts, chattel paper, inventory, collateral, instruments (including promissory notes), investment property, documents, deposit accounts, letter-of-credit rights, intellectual property rights, general intangibles (including payment intangibles), supporting obligations and, to the extent not listed above as original collateral, proceeds, insurance proceeds and products of the foregoing. Notwithstanding the foregoing, the term "Collateral" shall not include any rights or interests in avoidance actions pursued under chapter 5 of the Bankruptcy Code.

4. <u>Representations, Warranties and Agreements</u>. Debtor represents, warrants and agrees that:

(a) Debtor has (or will have at the time it acquires rights in the Collateral hereafter arising) and will maintain so long as the Security Interest may remain outstanding, rights to the Collateral and all proceeds thereof, free and clear of all interests, liens, attachments, encumbrances and security interests except as Secured Party may otherwise agree in writing.

(b) Debtor will keep, preserve and maintain all Collateral in good repair, working order and condition, normal wear and tear and depreciation excepted.

(c) Debtor will promptly pay all taxes and other governmental charges levied or assessed upon or against any Collateral or upon or against the creation, perfection or continuance of the Security Interest, except to the extent that Debtor may contest any such taxes.

(d) Debtor will, at reasonable times and upon written request of the Secured Party, permit Secured Party or its representatives to examine or inspect any Collateral, or any evidence of Collateral, wherever located.

(e) Debtor will keep accurate books and records pertaining to the Collateral, and upon Secured Party's reasonable request, will permit Secured Party, or its employees, accountants, attorneys or agents, to examine and copy any or all of its records at reasonable times during Debtor's business hours.

(f) Debtor will promptly notify Secured Party of any loss or material damage to any Collateral or of any substantial adverse change, known to Debtor, in any Collateral. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Secured Party as part of the Collateral. Any insurance proceeds which have not been disbursed within three (3) months after their receipt and which Debtor has not committed to the repair or restoration of the Collateral shall be used to prepay the balance due under the Note at such time.

(g) Debtor shall procure and maintain appropriate insurance, which may include without limitation damage, theft and liability coverage together with such other insurance as Secured Party may require with respect to all the Collateral, in form, amounts, coverage and basis reasonably acceptable to Secured Party and issued by a company or companies reasonably acceptable to Secured Party. Debtor shall deliver to Secured Party copies

2

of all such insurance policies or certificates of insurance in form satisfactory to Secured Party within thirty (30) days of execution of this Security Agreement, including stipulations that coverage will not be canceled or diminished without at least thirty (30) days' prior written notice to Secured Party. In connection with all policies covering the Collateral, Debtor shall cause Secured Party to be named as an additional insured under all such policies, and will provide Secured Party with such loss payable or other endorsements as Secured Party may require. If Debtor at any time fails to obtain or maintain any insurance as required under this Security Agreement, Secured Party may (but shall not be obligated to) obtain such insurance as Secured Party deems appropriate, which will cover only Secured Party's interest in the Collateral, and may add the premiums for such insurance to the principal balance owed under the Credit Agreement and the Note.

(h)     Debtor, from time to time, will execute and deliver or endorse any and all instruments, documents, conveyances, assignments, security agreements, financing statements and other agreements and writings which the Secured Party may reasonably request in order to secure, protect, perfect or enforce the Security Interests or the rights of the Secured Party under this Security Agreement (but any failure to request or assure that Debtor executes, delivers or endorses any such item shall not affect or impair the validity, sufficiency or enforceability of this Security Agreement and the Security Interests, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion). Secured Party shall have the right to file any financing statement, continuation statement, or amendment to any financial statement in connection therewith without the consent or approval of Debtor. Debtor shall take, or assist Secured Party in taking, whatever additional steps necessary or reasonably requested by Secured Party to identify Secured Party as a lienholder on any certificates of ownership or other applicable documents of title to the Collateral. Secured Party shall have the right to retain all certificates of ownership or other applicable documents of title to the Collateral until the Amount is paid in full and Secured Party's security interest in the Collateral is released.

(i)     Debtor will perform, comply with and abide by all laws, ordinances, rules, regulations and orders of governmental authorities now or hereafter affecting the Collateral.

If Debtor at any time fails to perform or observe any of the foregoing agreements and such failure is not cured within fifteen (15) days of written notice from Secured Party, Secured Party may, but need not, perform or observe such agreements on behalf and in the name, place and stead of Debtor (or, at the Secured Party's option, in the Secured Party's name) and may, but need not, take any and all other actions which the Secured Party may reasonably deem necessary to cure or correct such failure (including, without limitation, the payment of taxes, the procurement and maintenance of insurance, the execution of assignments, security agreements and financing statements, and the endorsement of instruments); and Debtor shall thereupon pay to Secured Party within fifteen (15) days of written demand the documented amount of all monies reasonably expended and all costs and expenses reasonably incurred by Secured Party (including reasonable attorneys' fees and legal expenses) in connection with or as a result of the performance or observance of such agreements or the taking of such action by the Secured Party, together with interest thereon from the date expended or incurred at the default rate of interest as provided in the Note.

3

5.     Debtor's Right to Possession.  So long as no Event of Default has occurred and is continuing, Debtor shall have the exclusive right of possession and use of the Collateral.

6.     Protection of Secured Party's Interest.  If Debtor fails to perform the covenants and agreements contained herein and if such failure is not cured within fifteen (15) days following written notice from Secured Party, or if any action or proceeding is commenced which affects the Collateral or title thereto, or the interest of Secured Party therein, then Secured Party, at Secured Party's option, may make such appearances, disburse such sums, and take such action as Secured Party deems necessary, in its reasonable discretion, to protect its interest in the Collateral.  Any reasonable amounts disbursed by Secured Party pursuant to this Paragraph, with interest thereon, shall become additional indebtedness of Debtor secured by this Security Agreement.  Unless Debtor and Secured Party agree in writing to other terms of payment, such amounts shall be due and payable within fifteen (15) days of written notice to Debtor setting forth the documented amount thereof.  Nothing contained in this Paragraph shall require Secured Party to incur any expense or take any action.

7.     UCC Financing Statements.  Debtor authorizes Secured Party to file any financing statement, continuation statement or other instrument or document necessary or, in the opinion of Secured Party, advisable to perfect the Security Interest created by this Security Agreement. From time to time, Debtor shall promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or that Secured Party may reasonably request in order to perfect and protect any security interest granted or purported to be granted hereby.

8.     Books and Records.  Debtor shall keep, and maintain at its principal place of business, accurate books and records pertaining to the Collateral or its proceeds. Debtor shall, from time to time promptly upon request of Secured Party, make such books and records available for inspection and copying by Secured Party during normal business hours.

9.     Events of Default.  Each of the following is an Event of Default under this Security Agreement: (i) an Event of Default under the Note or Credit Agreement; or (ii) any failure by Debtor to comply with any material terms or conditions of this Security Agreement after receipt of written notice and a reasonable opportunity to cure (but not less than fifteen (15) days, in any case).

10.     Remedies.  Upon the occurrence and during the continuance of an Event of Default, Secured Party may, after giving written notice of such Event of Default to Debtor, exercise one or more of the following rights and remedies: (i) exercise and enforce any and all rights and remedies under the Note, the Credit Agreement and/or this Security Agreement; (ii) exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC, including without limitation, the right to take possession of Collateral, or any evidence thereof, proceeding without judicial process or by judicial process and the right to sell at a private sale or public auction, or otherwise dispose of any or all of the Collateral, and in connection therewith Debtor will on demand assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties, and Secured Party shall have the right to take immediate possession of said

4

Collateral and may enter the premises of Debtor or wherever said Collateral is located, and shall have the right to keep and store the same on said premises until sold. If notice to Debtor of any intended disposition of Collateral or any other intended action is required by law in a particular instance, the timing of such notice shall be deemed commercially reasonable if given (in the manner specified in Paragraph 13) at least thirty (30) calendar days prior to the date of intended disposition or other action; (iii) without notice or demand, offset any indebtedness Secured Party then owes to Debtor, whether or not then due, against any obligation then owed to Secured Party by Debtor, whether or not then due; (iv) exercise or enforce any and all other rights or remedies available by law or agreement against the Collateral, against Debtor, or against any other person or property; and (v) accelerate the indebtedness under the Note and declare the entire principal balance under the Note Loans immediately due and payable and require immediate payment thereof by Debtor.

       11.    <u>Non-Waiver</u>. This Security Agreement cannot be waived, modified, amended, terminated or discharged, and the Security Interests cannot be released, except when given in writing signed by Secured Party. A waiver so signed shall be effective only in the specific instance and for the specific purpose given. Mere delay or failure to act shall not preclude the exercise or enforcement of any rights and remedies available to Secured Party.

       12.    <u>Rights Cumulative</u>. All rights and remedies of Secured Party shall be cumulative and may be exercised singularly in any order or sequence, or concurrently, at Secured Party's option, and the exercise or enforcement of any such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other.

       13.    <u>Notices</u>. All notices to be given to either party shall be deemed sufficiently given if delivered or mailed by registered, certified or ordinary mail, postage pre-paid, to such party at its address set forth below, with a copy to its counsel via mail, postage pre-paid and email as follows:

<u>Debtor</u>:                                    <u>Secured Party</u>:
Aero Mechanical Industries, Inc.            AerSale, Inc.
Attn: Mark Ozenick                          Attn: Nicolas Finazzo
805 West Idaho Street                       121 Alhambra Plaza, Suite 1700
Boise, Idaho 83702                          Coral Gables, FL 33134

       14.    <u>Expenses</u>. Debtor shall pay to Secured Party on demand any and all reasonable attorneys' fees and other expenses incurred by Secured Party in connection with the enforcement of this Security Agreement and, if Secured Party is the prevailing party in any action to enforce this Security Agreement, reasonable attorneys' fees and expenses which may be expended by Secured Party to obtain or enforce payment as against Debtor in such action. If Debtor is the prevailing party in any such action, Secured Party shall pay its reasonable attorneys' fees and expense. All expenses of Secured Party relating to the disposition of the Collateral following an Event of Default, including without limitation the expenses of retaking, holding, insuring, repairing for sale and selling the Collateral, shall become a part of the indebtedness secured by this Security Agreement and shall be payable on demand.

5

15. <u>Miscellaneous</u>. This Security Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns. This Security Agreement shall be governed by the laws of the State of New York. If any provision or application of this Security Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications which can be given effect, and this Security Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby. Debtor waives notice of the acceptance of this Security Agreement by the Secured Party.

16. <u>Construction</u>. The terms and conditions of this Security Agreement shall be construed as a whole according to their fair meaning and not strictly for or against any party. The parties acknowledge that each of them has reviewed this Security Agreement and has had the opportunity of having their attorneys review this Security Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Security Agreement or of any of its schedules, exhibits or amendments.

17. <u>Counterparts</u>. This Security Agreement may be executed in any number of counterparts and each such counterpart shall for all purposes be deemed an original, and all such counterparts shall together constitute but one and the same instrument. Any signature page of this Security Agreement may be detached from any counterpart without impairing the legal effect of any signatures, and may be attached to another counterpart, identical in form, but having attached to it one or more additional signature pages. This Security Agreement may be executed by signatures provided by electronic transmission, which signatures shall be as binding and effective as original signatures.

IN WITNESS WHEREOF, the undersigned has executed this Security Agreement as of the date first set forth above.

Debtor:                                          Secured Party:

AERO MECHANICAL INDUSTRIES,        AERSALE, INC., a Florida corporation
INC., a New Mexico corporation


By:_____        By:_____
    Mark Ozenick, its President        Name: _____
                                    Title: _____

6